**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KENNETH STAFFORD, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 23 C 3173 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| MARCIN CHOJNACKI, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Kenneth Stafford claims Defendants Laurena "Lori" Mikosz and Marcin Chojnacki tricked him into buying two run-down apartment buildings. While holding themselves out as Stafford's real-estate brokers, Mikosz and Chojnacki allegedly fed him false assurances about the buildings' condition and profitability. Behind the scenes, Mikosz's and Chojnacki's associates, the remaining Defendants, through various puppet entities, bought the buildings and resold them to Stafford at a significant markup. Stafford sued, alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 1). Defendants now move to dismiss. (Dkts. 24, 27). For the reasons below, the motions [24, 27] are denied.

## BACKGROUND

In April 2020, Plaintiff Kenneth Stafford, an Illinois citizen, learned about CitiPoint Properties ("CitiPoint"), a company that helped real-estate investors find undervalued and underperforming properties—so-called "directly sourced" properties. (*Id.* at ¶¶ 19–20).[1] CitiPoint promised "rapidly increasing equity and high cash flow." (*Id.* at ¶ 19). Interested in the

---

[1] At the time, CitiPoint was an "unincorporated enterprise," organized by Defendant Marcin Chojnacki, that appeared to be a real-estate investment firm. (*Id.* at ¶ 11). Later, on December 28, 2022, CitiPoint reorganized as Citypoint Illinois, LLC, which is owned and controlled by non-party Citypoint Group, Inc. (*Id.*)

opportunity, Stafford sent a query to CitiPoint "about multi-family real estate opportunities." (*Id.* at ¶ 22). Chojnacki, who was in Illinois, replied, telling Stafford that he and Defendant Lori Mikosz were real-estate agents and brokers for Chase Real Estate LLC ("Chase RE"), an affiliate of CitiPoint. (*Id.* at ¶ 24). Throughout the summer of 2020, and continuing throughout 2021 and 2022, Chojnacki and Stafford had "sustained email and phone interactions." (*Id.* at ¶ 23). Chojnacki and Mikosz represented to Stafford that he would be "directly purchasing buildings that were underperforming because those buildings were owned and self-managed by local landlords." (*Id.* at ¶ 30). By purchasing property at a bargain and using Mainstreet Property Management LLC's ("Mainstreet") property-management service, Mikosz proposed, Stafford could expect "substantial cash flow." (*Id.* at ¶ 31). Mikosz and Chojnacki led Stafford to believe that they would represent him as brokers of Chase RE, and "the transactions would be safely negotiated and consummated under the auspices of Chase Real Estate." (*Id.* at ¶¶ 27, 58).

In May 2022, Mikosz sent Stafford information about two properties that he later purchased: 2646 North Harlem Avenue and 2650 North Harlem Avenue in Elmwood, Illinois ("the Properties"). (*Id.* at ¶¶ 18, 33–36, 65–66). Mikosz told Stafford the first property was "being sold at a discount and was not properly managed by the local landlord." (*Id.* at ¶ 35). She then introduced the second property and said the seller was willing to sell both Properties to Stafford at a $20,000 discount. (*Id.* at ¶ 36). During the due diligence period, Mikosz chose an inspector to complete the building inspection, and Stafford "was allowed to see only two of the tenant units." (*Id.* at ¶¶ 60–62). Mikosz assured Stafford that both Properties, apart from minor repairs, "were in good condition and fully rented with all the tenants paying on time." (*Id.* at ¶¶ 37–38, 42, 63). Mikosz explained that $1.58 million for the Properties was a "discount" price and, with the assistance of Mainstreet, the investment would be profitable. (*Id.* at ¶¶ 39–41, 43–45, 50). Stafford

2

believed that Chojnacki and Mikosz, as his brokers, found these discounted properties for him and acted with his best interests in mind. (*Id.* at ¶¶ 46–48).

Based on these representations, Stafford contracted to purchase the Properties on May 10, 2022 and May 17, 2022. (*Id.* at ¶ 33; Dkt. 1-4). Ahead of the August 15, 2022 closing on both Properties, (*id.* at ¶¶ 65–66), Defendants told Stafford that the pre-sale inspection had uncovered no issues. (*Id.* at ¶ 92). In addition, on the day of closing, Irwin, Midwest Title, and other Defendants told Stafford that no pre-sale inspection was necessary. (*Id.* at ¶ 99).

Unbeknownst to Stafford, the Properties were not owned by a local landlord, but by Defendant Harlem Elmwood LLC ("Harlem Elmwood"), an entity owned and controlled by Chojnacki and Defendant Robert Rixer through Defendant Illinois Assets LLC. (*Id.* at ¶¶ 6, 53). Kathleen Long, Chojnacki's "paramour" and roommate, signed the purchase agreement as the seller for the Properties, and Defendant Rachel Irwin, signed as the seller's attorney. (*Id.* at ¶ 54). Moreover, Defendants had acquired the Properties for $1.3 million two months earlier—$280,000 under Stafford's purchase price. (*Id.* at ¶ 50).

Throughout the dealings with Stafford, Irwin acted on behalf of Harlem Elmwood and Defendant Midwest Title and Closing Services LLC ("Midwest Title"). (*Id.* at ¶ 102). Through Midwest Title, Irwin provided "registered agent services to the various entities"; she housed "various legal operations" relating to the entities and deals; and she charged Stafford a fee for "closing coordination." (*Id.* at ¶¶ 103–04). Midwest Title—owned by Irwin, Chojnacki, and nonparty XYZABC, Inc., of which Irwin is the president—shares office space with Irwin, Chojnacki, Mikosz, Mainstreet, and Defendant EJ Investment Group Inc. ("EJ Investment"), which owns and controls Mainstreet. (*Id.* at ¶¶ 8–10, 114). Chase RE received a commission of $55,300 at the closing of the Properties. (*Id.* at ¶¶ 70–71).

In October 2022, following the closing, Defendants invited Stafford, along with other clients, to an event at Chase RE's Roselle office where Stafford met Chase RE's owner, Defendant Christian Chase. (*Id.* at ¶¶ 81–83). Chojnacki and Rixer were also in attendance. (*Id.* at ¶ 83). The event emphasized Chase RE's expertise in finding "bargains" and "deals" for off-market properties and brokering the purchases—encouraging Stafford and others to take part in these "lucrative" deals. (*Id.* at ¶¶ 84, 88). Yet, Christian Chase, Chase RE, Chojnacki, and Rixer all failed to mention to Stafford that "Defendants were themselves secretly purchasing the properties at a discount and keeping the profit." (*Id.* at ¶¶ 85–86). Nor did Chase RE, Chojnacki, or Rixer disclose to Stafford that they misrepresented the properties' values to clients' lenders to secure financing. (*Id.* at ¶ 87).

That same month, Stafford received a pre-sale inspection report, dated September 20, 2022, from the Village of Elmwood Park notifying him of various "repairs and violations," for which he was responsible. (*Id.* at ¶ 89; Dkt. 1-11). Stafford had never seen this report, and it contradicted Defendants' representation that the pre-sale inspection found no issues. (*Id.* at ¶¶ 91–92). Irwin never shared this report with Stafford. (*Id.* at ¶ 97). In addition, Stafford discovered that, on August 18, 2022—three days *after* closing—Irwin, acting as the seller's attorney and title agent, had sent a notice of proposed sale to the Village. (*Id.* at ¶ 94). On October 18, 2022, without Stafford's authorization or knowledge, Chojnacki's mother submitted to the Village an affidavit accepting responsibility for the repairs on Stafford's behalf and a power of attorney (forged by Defendants and notarized by Irwin) appointing Chojnacki's mother as Stafford's power-of-attorney agent. (*Id.* at ¶ 98; *see* Dkt. 1-11).

After taking ownership, Stafford also learned that the Properties had no local landlord seller. (*Id.* at ¶ 53). Nor was the $1.58 million purchase price a "bargain," since Defendants bought the Properties for $1.3 million. (*Id.* at ¶¶ 45, 50). The Properties were not fully leased, and the

tenants were not current on their rent. (*Id.* at ¶ 56). The Properties were not in good condition and Defendants concealed building code violations from Stafford. (*Id.* at ¶¶ 57, 106). Despite these issues, Defendants, through Mainstreet and EJ Investment, have charged Stafford for unexplained costs and fabricated payments for non-existent or incomplete work on the Properties. (*Id.* at ¶¶ 106–10). Defendants have tried to "repeat the scam" by offering Stafford additional properties. (*Id.* at ¶ 116). Defendants have allegedly scammed other investors like Stafford. (*Id.* at ¶¶ 117–18).

Stafford filed this suit on May 19, 2023. (Dkt. 1).[2] In Count I of the Complaint, alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c), (d). (*Id.* at ¶¶ 119–39). Count II is a common-law fraud claim against Mikosz, Chojnacki, and Irwin. (*Id.* at ¶¶ 140–47). Count III alleges that Mikosz and Chojnacki violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq*. (*Id.* at ¶¶ 148–55). Count IV alleges Mikosz, Chojnacki, and Chase RE violated the Illinois Real Estate License Act (IRELA), 225 ILCS 454/1 *et seq*. (*Id.* at ¶¶ 156–62). Count V brings a negligent-misrepresentation claim against Mikosz and Chojnacki. (*Id.* at ¶¶ 163–70). Count VI brings an unjust enrichment claim against all Defendants. (*Id.* at ¶¶ 171–76). Finally, Count VII states a breach-of-contract claim against Harlem Elmwood, alleging that it breached its contractual duty to provide the Buyer with an accurate rent roll. (*Id.* at ¶¶ 177–84).

---

[2] This is one of eleven related actions proceeding before this Court. *See* Amended Complaint, *Malik v. Prairie Raynor LLC*, No. 23-cv-01182 (N.D. Ill. Mar. 2, 2023); Complaint, *Shankar v. Fairview Ave. Props. LLC*, No. 23-cv-01469 (N.D. Ill. Mar. 9, 2023); Complaint, *Abbas v. Mikosz*, No. 23-cv-01691 (N.D. Ill. Mar. 17, 2023); *Sor v. TCF Nat'l Holdings, Inc.*, No. 23-cv-02401 (N.D. Ill. Apr. 18, 2023); Complaint, *Chen v. Chojnacki*, No. 23-cv-02520 (N.D. Ill. Apr. 21, 2023); Complaint, *Michel v. Chojnacki*, No. 23-cv-02546 (N.D. Ill. Apr. 24, 2023); Complaint, *Said v. Chojnacki*, No. 23-cv-02858 (N.D. Ill. May 5, 2023); Amended Complaint, *Haynes v. Fairview Ave. Props. LLC*, No. 23-cv-01596 (N.D. Ill. May 16, 2023); Complaint, *Hui v. Chojnacki*, No. 23-cv-03430 (N.D. Ill. May 31, 2023); Complaint, *Fernandez v. Chojnacki*, No. 23-cv-04406 (N.D. Ill. July 7, 2023).

Chase RE, joined by the remaining Defendants (together, the "Chase RE Defendants"), moves to dismiss the Complaint for failure to state a claim. (Dkt. 24; *see also* Dkts. 26, 28, 29). Separately, Harlem Elwood moves to dismiss Count VII for failure to state a claim. (Dkt. 27).

## LEGAL STANDARD

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Russell v. Zimmer, Inc.*, 82 F.4th 564, 570 (7th Cir. 2023) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

For claims sounding in fraud, Federal Rule of Civil Procedure 9(b) requires plaintiffs to "state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, a plaintiff must "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)).

**DISCUSSION**

## I. Racketeer Influenced and Corrupt Organizations Act (RICO) (Count I)

In Count I, Stafford alleges that Chojnacki, Mikosz, Rixer, Citypoint Illinois, Harlem Elmwood, and Illinois Assets (collectively, "the § 1962(c) Defendants") violated § 1962(c), (Dkt. 1 ¶¶ 119–129), while the remaining Defendants Irwin, Midwest Title, EJ Investment, Mainstreet, and Chase RE (collectively, "the § 1962(d) Defendants") violated § 1962(d), (*id.* at ¶¶ 130–35). Defendants challenge Stafford's claims under both subsections. Before diving into the RICO allegations, it is worth noting that the complaints in the ten related cases pending before this Court—all describing similar schemes to defraud other plaintiffs by the same or similar defendants[3]—give Stafford's claims a plausibility boost. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) ("It is appropriate to accord limited corroborative weight to allegations in another's lawsuit.").

### A. Section 1962(c)

Under § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).[4] Section 1964(c) "empowers private parties to bring lawsuits against those engaged in racketeering activity when that activity has caused them harm." *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1093 (7th Cir. 2018) (citing

---

[3] *See* Amended Complaint, *Malik*, No. 23-cv-01182; Complaint, *Shankar*, No. 23-cv-01469; Complaint, *Abbas*, No. 23-cv-01691; Complaint, *Sor*, No. 23-cv-02401; Complaint, *Chen*, No. 23-cv-02520; Complaint, *Michel*, No. 23-cv-02546; Complaint, *Said*, No. 23-cv-02858; Amended Complaint, *Haynes*, No. 23-cv-01596; Complaint, *Hui*, No. 23-cv-03430; Complaint, *Fernandez*, No. 23-cv-04406.

[4] Although Stafford, like Defendants, resides in Illinois, that does not prevent him from alleging an effect on interstate commerce. *See, e.g.*, *United States v. Muskovsky*, 863 F.2d 1319, 1325 (7th Cir. 1988) ("The required nexus between the activities of the enterprise and interstate commerce need not be great; 'even a minimal effect on interstate commerce satisfies this jurisdictional element.'" (quoting *United States v. Bagnariol*, 665 F.2d 877, 892 (9th Cir. 1981))). Defendants do not attack Stafford's allegations from this angle.

*Rotella v. Wood*, 528 U.S. 549, 557 (2000)). To state a claim under § 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *accord Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 587–88 (7th Cir. 2017).

### 1.    Conduct of an Enterprise

A plaintiff's first step under § 1962(c) is to identify an "enterprise." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013) (citation omitted). An "enterprise" means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Walgreen*, 719 F.3d at 853 (observing that the statutory definition of "enterprise" is construed broadly). An "association-in-fact" enterprise has "three structural features: [1] a purpose, [2] relationships among those associated with the enterprise; and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009); *Sabrina*, 869 F.3d at 588. Put simply, this type of enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Separate from the RICO enterprise, the plaintiff must point to a "person"—that is, the defendant. *Walgreen*, 719 F.3d at 853 (citing *Cedric Kushner*, 533 U.S. at 161); *see also Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004) ("Without a difference between the defendant and the 'enterprise' there can be no violation of RICO."). "[T]hat 'person' must have conducted or participated in the conduct of the *enterprise's* affairs, not just its own affairs." *Walgreen*, 719 F.3d at 854 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (cleaned up). In this context,

conduct refers to a defendant's operation or management of the enterprise. *See Sabrina*, 869 F.3d at 589 (citing *Reves*, 507 U.S. at 179).

Here, Stafford has sufficiently pleaded an association-in-fact enterprise with purpose, relationships, and longevity. He alleges that the § 1962(c) Defendants—which no one disputes are RICO "persons"—"were associated in fact" as the "CitiPoint Enterprise." (Dkt. 1 ¶¶ 120–21). That enterprise's "primary purpose . . . was to lure and then fleece unsuspecting real estate investors" for financial gain. (*Id.* at ¶ 122). To ensure the CitiPoint Enterprise's profit at the expense of investors like Stafford, its members allegedly worked on both sides of real-estate transactions. Mikosz and Chojnacki worked together from their shared office, doing business as CitiPoint (later, as Citypoint Illinois). After drawing Stafford in with promises of too-good-to-be-true investment opportunities, Mikosz and Chojnacki purported to represent Stafford as real-estate brokers in his purchase of the Properties. Mikosz, Chojnacki, and other Defendants touted their expertise at finding great bargains for off-market properties, and they encouraged Stafford to trust their numerous and repeated misstatements about the Properties' condition and profitability. After Stafford agreed to buy the Properties for $1.58 million, Chojnacki and his affiliate Rixer, through Illinois Assets and Harlem Elmwood, bought the Properties for $1.3 million and resold them to Stafford at a $280,000 profit. Behind the scenes, Irwin helped pulled the strings on the complex web of various puppet entities that helped shield the conflicts of interest from view.

The sophisticated coordination and relationships among Defendants on both sides of Stafford's purchase reflect "an unusual degree of economic interdependence" that helps nudge the existence of the CitiPoint Enterprise across the plausibility threshold. *See Bible v. U.S. Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015); *see also, e.g., Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384, 388–89 (7th Cir. 2010) (holding that the plaintiff adequately

alleged an enterprise by pointing to a coordinated fraudulent scheme); *cf. Walgreen*, 719 F.3d at 855 ("RICO does not penalize parallel, uncoordinated fraud." (citing *Boyle*, 556 U.S. at 947 n.4)). Indeed, that coordination appears essential to the success of the alleged scheme. Rather than "a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest," therefore, the CitiPoint Enterprise looks more like a "truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *See Bible*, 799 F.3d at 655–56. Moreover, the alleged CitiPoint Enterprise lasted long enough for its members to pursue the enterprise's purpose of attracting investors and profiting from their purchases. *See Walgreen*, 719 F.3d at 853 (citing *Boyle*, 556 U.S. at 946). After Stafford closed on the Properties, Defendants continued to offer him additional properties and, through Mainstreet and EJ Investment, charged him for a variety of exorbitant and unspecified expenses. Defendants have allegedly scammed other investors like Stafford.

Defendants contend that Stafford has failed to plead a distinct enterprise because there is "complete identity between the alleged 'persons' and the alleged members of the 'enterprise.'" (Dkt. 25 at 7); *see Baker*, 357 F.3d at 692. This argument rests on the mistaken view that an enterprise's members cannot be named as defendants. Of course, an entity cannot be liable under RICO for "operat[ing] *itself* unlawfully." *See Baker*, 357 F.3d at 691–92; *Walgreen*, 719 F.3d at 854; *see also Haroco, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 747 F.2d 384, 402 (7th Cir. 1984), *aff'd on other grounds*, 473 U.S. 606 (1985). Yet, a plaintiff may state a RICO claim against each member of an association-in-fact enterprise. *See Haroco*, 747 F.2d at 401 ("Where persons associate 'in fact' for criminal purposes . . . each person may be held liable under RICO for his, her, or its participation in conducting the affairs of the association in fact through a pattern of racketeering activity.").

To satisfy RICO's distinctness requirement, the enterprise can "be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization)" separate from the "person." *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985); *see also Cedric Kushner*, 533 U.S. at 162–63 ("The corporate owner/employee, a natural person is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." (citing *McCullough*, 757 F.2d at 144)). Stafford's allegations suggest that the CitiPoint Enterprise is distinct from each of the § 1962(c) Defendants who served as members. Unlike the enterprise's members—who are "persons," capable of holding property— the CitiPoint Enterprise is a network of individuals and entities, associated in fact, and thus unable to "hold any interest in property or even be brought into court." *See Haroco*, 747 F.2d at 401. Accordingly, Stafford has alleged the existence of a distinct enterprise.

Stafford has also plausibly alleged that the § 1962(c) Defendants participated in operating or managing the CitiPoint Enterprise's affairs. *See Sabrina*, 869 F.3d at 589 ("[T]o satisfy the 'conduct' element, a plaintiff must allege that the defendant participated in the operation or management of the enterprise itself, and that the defendant played some part in directing the enterprise's affairs." (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727–28 (7th Cir. 1998))) (cleaned up); *Reves*, 507 U.S. at 179; *see also Bible*, 799 F.3d at 657. The precise hierarchy of the CitiPoint Enterprise may be unclear. Yet, Stafford has alleged that Chojnacki and Mikosz, through Citypoint Illinois, attracted and purported to represent unwitting investors while Chojnacki and Rixer, through Illinois Assets and Harlem Elmwood, purchased and resold properties to those investors. These allegations permit a reasonable inference that the § 1962(c) Defendants held leadership roles and took part in directing the enterprise.

11

### 2. Pattern of Racketeering Activity

A pattern of racketeering activity requires the completion of at least two predicate acts within ten years. *Bible*, 799 F.3d at 659; 18 U.S.C. § 1961(5). The two violations "must exhibit continuity plus relationship. Related predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sabrina*, 869 F.3d at 589 (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016)) (cleaned up); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Continuity is 'centrally a temporal concept.'" *Empress*, 831 F.3d at 828 (quoting *H.J.*, 492 U.S. at 242). Analytically, "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J.*, 492 U.S. at 241).

While Defendants do not challenge Stafford's satisfaction of the relationship-plus-continuity test, they argue that Stafford has failed to adequately plead predicate acts. (Dkt. 25 at 7–10). As predicate acts, Stafford alleges mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (Dkt. 1 ¶¶ 125–26). "The elements of mail fraud are: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme." *Bible*, 799 F.3d at 657 (quoting *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298–99 (7th Cir. 2003)) (cleaned up); 18 U.S.C. § 1341. Wire fraud has the same elements, except that the defendant must use interstate wires instead of mail to further the scheme. *Bible*, 799 F.3d at 657 (citing *United States v. Green*, 648 F.3d 569, 577–78 (7th Cir. 2011)); 18 U.S.C. § 1343.

Stafford's allegations of mail and wire fraud are subject to Rule 9(b)'s particularity requirement. *See Bible*, 799 F.3d at 658; Fed. R. Civ. P. 9(b). At a minimum, therefore, Stafford must "describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Bible*, 799 F.3d at 658 (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001)). Yet, Rule 9(b) does not demand "form for form's sake": "although 'plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts,' they still must 'use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Pirelli*, 631 F.3d at 442 (internal quotation omitted). The requisite level of detail may vary from case to case. *Id.* (citing *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998)). Since "fair notice is the 'most basic consideration underlying Rule 9(b),' in a case involving multiple defendants, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (quoting *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 777–78 (7th Cir. 1994)).

Stafford alleges that "Defendants placed ads on the Internet and on social media with the intent to induce investors to participate in 'directly sourced' real estate opportunities." (Dkt. 1 ¶ 126(a)). Yet, Defendants "actually intended to sell the duped investor their own significantly marked-up property." (*Id.*) Stafford alleges further that Defendants engaged in a "sustained fiction," "replete with misrepresentations and calculated omissions" to mislead Stafford into believing that he was buying property from an "widower landlord" at a bargain. (*Id.* at ¶ 126(b)). Stafford's RICO Count incorporates his previous, more detailed allegations. (*See id.* at 20). While

some of these allegations lump Defendants together, others describe the "who, what, when, where, and how" of the fraud.

In April 2020, using wired communication, Chojnacki replied to Stafford's query about CitiPoint (now Citypoint Illinois). (*Id.* at ¶¶ 19–24). Subsequently, Chojnacki and Stafford had "sustained email and phone interactions" from the summer of 2020 into early 2022. (*Id.* at ¶ 23). In these exchanges, Chojnacki, and later Mikosz, told Stafford that CitiPoint could help him buy underperforming real estate from "local landlords" and make "substantial cash flow" with proper management. (*Id.* at ¶¶ 30–31). In May 2022, Mikosz told Stafford that the Properties, minor repairs aside, "were in good condition and fully rented" by non-delinquent tenants. (*Id.* at ¶¶ 37–38, 42, 63). She also represented that the seller was offering the Properties at a "discount," assuring Stafford that the Properties would be profitable. (*Id.* at ¶ 35, 39–41, 43–45, 50). Stafford alleges Chojnacki and Mikosz made these false statements with intent to defraud him. (*See id.* at ¶¶ 24–26, 30–31, 126); *see Bible*, 799 F.3d at 658 (observing that fraudulent intent "may be alleged generally" (citing Fed. R. Civ. P. 9(b))).

Further, before the August 15, 2022 closing, some unspecified Defendants told Stafford that the pre-sale inspection revealed no issues, which turned out to be untrue. (Dkt. 1 ¶¶ 89, 91–93). And on the day of closing, Irwin, Midwest Title, and others told Stafford that no pre-sale inspection was necessary. (*Id.* at ¶ 99). Stafford was surprised to learn later that he was responsible for repairs and violations described in the Village of Elmwood Park's pre-sale inspection report. (*Id.* at ¶ 89; Dkt. 1-11). Upon further digging, Stafford learned that Irwin did not send the notice of proposed sale until three days *after* closing, and one month before the Village issued a pre-sale inspection report. (*Id.* at ¶¶ 94–95). To boot, on October 18, 2022, Chojnacki's mother, without Stafford's permission, accepted responsibility for the repairs on Stafford's behalf and Defendants

forged Stafford's name on a power of attorney (notarized by Irwin) to make Chojnacki's mother his power-of-attorney agent. (*Id.* at ¶ 98).

Chojnacki and Rixer, using Illinois Assets and Harlem Elmwood, participated in the alleged fraud by purchasing the Properties in June 2022, and selling them to Stafford two months later. (*Id.* at ¶¶ 6–7, 50, 65). Considering Rixer's involvement with Chojnacki and the two entities, it is plausible to infer that he contributed to the scheme with fraudulent intent. Stafford's well-pleaded allegations add up to at least two plausible instances of wire fraud—a sufficient pattern of racketeering activity. *See Empress*, 831 F.3d at 827 ("Each use of the wires can be an individual count of wire fraud and an individual RICO predicate for the purpose of establishing two predicate acts.").[5] Accordingly, Stafford's § 1962(c) claim survives.

### B. Section 1962(d)

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To state a claim under § 1962(d), a plaintiff "must allege that the defendant (1) agreed to maintain an interest in or control of an enterprise, or to participate in an enterprise's affairs, (2) through a pattern of racketeering activity, and (3) that the defendant agreed that some member of the conspiracy (not necessarily the defendant herself) would commit at least two predicate acts in furtherance of those goals." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017) (citing *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011)). Subsection (d)'s concern is "the agreement to participate in an endeavor, which if completed would violate a substantive provision of the Act." *Id.* (citing *Goren*, 847 F.3d at 731–32); *see also Empress*, 831 F.3d at 822–23 ("As with any conspiracy, a RICO conspirator 'must intend to further an endeavor which, if completed, would satisfy all elements of

---

[5] Stafford alleges that "[t]he CitiPoint Enterprise conducted its racketeering activity, in part, . . . through the mailing of checks." (*Id.* at ¶ 124).

a substantive criminal offense, but it suffices that he would adopt the goal of furthering or facilitating the criminal endeavor.'" (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997))); *Domanus*, 847 F.3d at 479. Here, that substantive provision is subsection (c).

Defendants argue that Stafford's § 1962(d) claim fails because his § 1962(c) claim is deficient. (Dkt. 25 at 6–7); *see, e.g.*, *Patel v. Mahajan*, 2012 WL 3234397, at *5 (N.D. Ill. Aug. 6, 2012) ("When a § 1962(c) claim fails, a § 1962(d) claim premised on the same facts fails as well." (collecting cases)). Yet, Stafford has stated a claim under § 1962(c). Defendants raise no other arguments against Stafford's § 1962(d) claim, and the Court declines to invent arguments on their behalf. *See Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel." (quoting *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011))). Thus, Count I may proceed in its entirety.

## II.     State-Law Claims (Counts II–VII)

In Stafford's remaining claims under state law, he alleges common-law fraud (Count II); violation of the ICFA (Count III); violation of the IRELA (Count IV); negligent misrepresentation (Count V); unjust enrichment (Count VI); and breach of contract (Count VII). (Dkt. 1 ¶¶ 140–84).

### A.     Fraud, ICFA, IRELA, Negligent Misrepresentation, and Unjust Enrichment

With scant citations to caselaw, the Chase RE Defendants contend that Counts II, III, IV, and V, sound in fraud, and these claims fail to meet Rule 9(b)'s heightened pleading requirement "for the same reasons" as Stafford's RICO claim. (Dkt. 25 at 10–12). In the same vein, Defendants point out that Stafford's unjust-enrichment claim (Count VI) is "tied to the fate" of his other claims. (*Id.* at 12–13 (quoting *Vanzant v. Hill's Pet Nutrition*, 934 F.3d 730, 740 (7th Cir. 2019))); *see Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) ("Under

Illinoias law, there is no stand-alone claim for unjust enrichment."). Again, Stafford has stated a RICO claim, and the Court need not invent arguments for Defendants. *See Hicks*, 871 F.3d at 531. By failing to develop further arguments on the sufficiency of these state-law claims, Defendants have waived any arguments they might have made. *See Wernstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005); *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023).

### B.      Breach of Contract

Like the Chase RE Defendants, Harlem Elwood argues—and Stafford appears to concede, (Dkt. 33 at 2–3)—that because the breach-of-contract claim sounds in fraud it is subject to Rule 9(b)'s heightened pleading standard. (Dkt. 27 at 2). Even so, Stafford's breach-of-contract claim is viable. To state a claim for breach of contract under Illinois law, a plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) damages. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 883 (7th Cir. 2022) (citing *Babbitt Muns., Inc. v. Health Care Serv. Corp.*, 64 N.E.3d 1178, 1886 (Ill. App. Ct. 2016)).

Stafford alleges Harlem Elwood breached the purchase agreement—specifically the obligation to provide a rent roll at closing—by providing a fabricated rent roll. (Dkt. 1 ¶¶ 178–79). Implicit in every contract under Illinois law is a duty of good faith and fair dealing. *Barwin v. Village of Oak Park*, 54 F.4th 443, 454 (7th Cir. 2022) (internal citation omitted); *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 690 (Ill. 1958). Despite Harlem Elwood's argument to the contrary, (Dkt. 27 at 2–3), providing a fabricated rent roll does not indicate good-faith performance of Harlem Elwood's obligation; it is a plausible breach. *See, e.g., Burger v. Spark Energy Gas, LLC*, 507 F. Supp. 3d 982, 990 (N.D. Ill. 2020) (observing that the duty of good faith

and fair dealing may support a breach-of-contract claim). So Stafford has stated a claim for breach of contract in Count VII.

## CONCLUSION

For the reasons above, Defendants' Motions to Dismiss [24, 27] are denied in their entirety. Stafford's claims in Counts I–VII may move forward consistent with this Opinion.

Virginia M. Kendall
United States District Judge

Date: December 6, 2023